# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Aug 14, 2025
s/ vge
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Information about the location of the cellular telephone assigned call number (414) 573-3465 as further described in Attachment A

Case No. 25-974M(NJ)

Matter No. 2025R00094

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the __________ District of __________
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 8/28/2025 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 03/27/2026.

Date and time issued: 8/14/2025 @ 11:28 a.m.

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

**<u>ATTACHMENT A3</u>**
**Property to Be Searched**
**Matter No. 2025R00094**

1. Records and information associated with the cellular device assigned call number **414-573-3465**, (referred to herein and in Attachment B3 as “the **Target Cell Phone 3**”), the subscriber is unknown that is in the custody or control of AT&T (“Service Provider”) a wireless telephone service provider headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida, 33408.

2. The **Target Cell Phone 3**.

<u>ATTACHMENT B3</u>

**Particular Things to be Seized**

**Matter No. 2025R00094**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A3 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A3:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone 3** for the time period **January 1, 2025 to the present**:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone 3**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the **Target Cell Phone 3** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone 3** will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical

GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

Honorable Stephen C. Dries, United States Magistrate Judge, has also issued an order pursuant to 18 U.S.C. § 3123, dated July 23, 2025, for such information associated with the **Target Cell Phone 3**.

c. Information about the location of the **Target Cell Phone 3** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone 3** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Joshua Ramos, Christopher Badgett, Kiara Ramos, Trayveon Roy, Isaac Sawyer, [redacted] Raymond Serrano, Deparis Hardin, Erica Carrion, Antonio Mendoza, Kevin Jones, Krystal Castillo, Andrew Gbur, Elion Leflore, Dale Fisher, Ryan Fisher, Travis Page, Shannon Gee, the unidentified male user of telephone number (414) 892-1281 (herein "UM1281"), the unidentified male user of telephone number (414) 651-3460 (herein "UM3460"),

Jesus Andrade Herrera, Katie Carmody, Anthony Buda, Mohamed Zormati, Edward Saez, Joshua Al Hakeem-Maaji Murphy, [redacted] Tiffany McCarver, Emmitt Hawkins, Orlando Rivas, [redacted] Patricia Andrade Gomez, Ondra Love-Bond, Yesica Alvarez, Marlon Triplett, [redacted], and others known and unknown, during the period of October 1, 2024 to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Aug 14, 2025
s/ vge
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information about the location of the cellular telephone assigned call number (414) 573-3465 as further described in Attachment A

Case No. 25-974M(NJ)

Matter No. 2025R00094

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ________________ District of ________________________ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843 (b), and 846 | Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled Substance. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 03/27/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Mark Haleen   Digitally signed by Mark Haleen
Date: 2025.08.12 18:32:17 -05'00'

*Applicant's signature*

Mark Haleen, FBI TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone *(specify reliable electronic means).*

Date: 8/14/2025

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**Matter No. 2025R94**

I, Mark Haleen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the following cellular telephones assigned call number:

a. **414-340-9162** with International Mobile Equipment Identity number 352938142179626 (the "**Target Cell Phone 1**"), has a listed subscriber of "No Name" and is used by Elion Leflore, whose service provider is Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921. The **Target Cell Phone 1** is described herein and in Attachment A1, and the location information to be seized is described herein and in Attachment B1.

b. **(414) 627-1965** (the "**Target Cell Phone 2**"), has a listed subscriber of "Sam Doe" and a listed address of 4241 West Capitol Drive, Milwaukee, Wisconsin and is used by Shannon Gee, whose service provider is US Cellular ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way Parsippany NJ 07054.[1] The **Target Cell**

1 According to the pleadings, as of August 6, 2025, **Target Cell Phone 2**, when researched, was assigned to US Cellular, which is now a T-Mobile US company as of a completed merger on August 1, 2025. US Cellular's updated address is 4 Sylvan Way Parsippany NJ 07054. US Cellular's former address was 8410 W. Bryn Mawr Avenue, Suite 800, Chicago, IL 60631.

**Phone 2** is described herein and in Attachment A2, and the location information to be seized is described herein and in Attachment B2.

c. **414-573-3465** (the "**Target Cell Phone 3**"), has a listed subscriber is unknown and is used by Ondra Love-Bond, whose service provider is AT&T ("Service Provider") a wireless telephone service provider headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida, 33408. The **Target Cell Phone 3** is described herein and in Attachment A3, and the location information to be seized is described herein and in Attachment B3.

(collectively **"Target Cell Phones"**).

2. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phones**.

3. I am a sworn law enforcement officer with the Village of Mount Pleasant and a sworn Task Force Officer with the Federal Bureau of Investigation (FBI), with authority to investigate federal offenses including violations of Titles 18 and 21 of the United States Code.

4. I have been employed as a Law Enforcement Officer with the Village of Mount Pleasant (Wisconsin) since September 2010 and a sworn Federal Task Force Officer with the FBI since January 2020. I have obtained a Bachelor of Science Degree in Sociology from Central

Michigan University. I have been involved in the enforcement and investigation of numerous violations of federal and state law to include drug trafficking investigations, firearm trafficking investigations, and violent crime related cases. I have personally conducted and participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit firearm and narcotics transactions in violation of federal law.

5. As part of my duties, I investigate criminal violations relating to narcotics trafficking, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, and 846. By virtue of my employment as a federal task force officer and prior law enforcement experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in numerous investigations into illegal drug distribution conspiracies.

b. I have interviewed witnesses, confidential human sources (CHS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments).

c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

d. I have also relied upon informants to obtain controlled substances from dealers.

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, fentanyl, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

g. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

h. I know that drug traffickers often use electronic equipment and cellular telephones to conduct drug trafficking operations.

i. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

6. As part of my duties, I also investigate criminal violations relating to unlawfully possessed firearms, firearms trafficking, and possession of machineguns including criminal violations of Federal firearms laws, including, but not limited to Title 18, United States Code, Sections 922, 933, and 924. By virtue of my employment as a federal task force officer and prior law enforcement experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in several investigations into illegal firearms and machinegun possession and firearms trafficking.

b. I am familiar with the language utilized over the telephone to discuss illegal firearms and machinegun conversion devices and know that the language is often limited, guarded, and coded.

c. I have utilized informants to investigate the sale and possession of illegal firearms, and I have also relied upon informants to obtain illegal firearms from dealers.

d. I know that people engaged in the illegal possession or distribution of firearms often use electronic equipment and cellular telephones to conduct firearm trafficking operations.

e. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

f. I have interviewed or participated in interviews of witnesses, confidential human sources (CHS), and sources of information (SOI) relative to the illegal possession and distribution of firearms.

7. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

8. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

9. As such, I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

10. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

11. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

12. As such, I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

13. The facts in this affidavit come from my personal observations, my training and experience, court ordered/subpoenaed records, Title III interceptions, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

14. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, §§ 841(a), 843(b), and 846 have been committed, are being committed, and/or will be committed by Quentin Apkarian, Joey Miramontes, Joshua Ramos, Christopher Badgett, Kiara Ramos, Trayveon Roy, Isaac Sawyer, [redacted] Raymond Serrano, Deparis Hardin, Erica Carrion, Antonio Mendoza, Kevin Jones, Krystal Castillo, Andrew Gbur, Elion Leflore, Dale Fisher, Ryan Fisher, Travis Page, Shannon Gee, the unidentified male user of telephone number (414) 892-1281 (herein "UM1281"), the unidentified male user of telephone number (414) 651-3460 (herein "UM3460"), Jesus Andrade Herrera, Katie Carmody, Anthony Buda, Mohamed Zormati, Edward Saez, Joshua Al Hakeem-Maaji Murphy, [redacted] Tiffany McCarver, Emmitt Hawkins, Orlando Rivas, [redacted] Patricia Andrade Gomez, Ondra Love-Bond, Yesica Alvarez, Marlon Triplett, [redacted] and others known and unknown. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

15. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

16. The United States, including Federal Bureau of Investigation is conducting a criminal investigation of Quentin Apkarian, Joey Miramontes, Joshua Ramos, Christopher Badgett, Kiara Ramos, Trayveon Roy, Isaac Sawyer, [redacted], Raymond Serrano, Deparis

Hardin, Erica Carrion, Antonio Mendoza, Kevin Jones, Krystal Castillo, Andrew Gbur, Elion Leflore, Dale Fisher, Ryan Fisher, Travis Page, Shannon Gee, the unidentified male user of telephone number (414) 892-1281 (herein "UM1281"), the unidentified male user of telephone number (414) 651-3460 (herein "UM3460"), Jesus Andrade Herrera, Katie Carmody, Anthony Buda, Mohamed Zormati, Edward Saez, Joshua Al Hakeem-Maaji Murphy, [redacted] Tiffany McCarver, Emmitt Hawkins, Orlando Rivas, [redacted], [redacted] Patricia Andrade Gomez, Ondra Love-Bond, Yesica Alvarez, Marlon Triplett, [redacted], and others known and unknown, regarding possible violations including violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 (Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled Substance). As detailed below, members of the Apkarian Drug Trafficking Organization ("Apkarian DTO") are actively selling controlled substances in southeastern Wisconsin.

17. Special Agents of the Federal Bureau of Investigations and local officers have received information concerning the illegal drug trafficking activities of members of the Apkarian DTO from a confidential human source ("CHS#1"):

i. CHS #1 has been reporting to the FBI since approximately September of 2024. CHS #1 is cooperating in exchange for monetary consideration. As of August 12, 2025, CHS #1 has received $34,213.72 in monetary compensation for CHS #1's cooperation with the FBI.[2] Certain information provided by CHS #1 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, multiple controlled narcotics purchases, and a review of information contained within law enforcement databases. CHS #1 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CHS #1 has

2 Additional controlled buys are likely to be attempted in the near future which could cause the total compensation and controlled buy count to increase prior to judicial authorization.

prior felony convictions for Burglary and Bail Jumping. CHS #1 previously had a pending criminal traffic charge for operating a vehicle after revocation, which was dismissed as consideration for CHS #1's cooperation with another law enforcement officer. I have discussed CHS #1's cooperation with the other law enforcement officer, and CHS #1 has provided reliable cooperation to that agency. CHS #1 has no criminal convictions in the past five years. At no time during CHS #1's cooperation with the FBI have I found CHS #1 to have provided false information or engage in untruthful or deceptive behavior.[3] As further detailed below, during controlled narcotics and/or firearms/machinegun purchases, CHS #1 surreptitiously recorded the narcotics and/or firearms/machinegun transactions at my direction. Case agents later debriefed CHS #1 concerning what occurred during each transaction and then compared CHS #1's version of events with the recordings and case agent observations. Each time, CHS #1's information was corroborated by these independent sources. The basis of CHS #1's information detailed below is CHS #1's own personal observations and participation on the controlled narcotics and/or firearms/machinegun purchases. Within the context of the information detailed and relied upon for purposes of this application, I believe that CHS #1 is credible and that CHS #1's information is reliable.

## PROBABLE CAUSE

18. Starting in October 2024, CHS#1 began conducting buys from Apkarian DTO members on behalf of law enforcement. To date, CHS#1 has conducted at least 31 buys from Apkarian DTO members for methamphetamine, marijuana, cocaine, fentanyl, and/or firearms.

19. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant (such as CHS#1) purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, s/he is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring

3 In July 2025, CHS #1 was involved in a physical altercation that did not result in any criminal charges for any of the parties involved. This event does not affect my belief that CHS #1 remains credible and that CHS #1's information remains reliable.

equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. If applicable, all of the calls to the target by the informant are consensually recorded calls under the direction and control of case agents and made in the presence of case agents. Additionally, case agents observe the informant dial the target's number on each occasion and the contact is verified through telephone records. When communication between the informant is done via electronic means (such as use of Facebook Messenger), case agents review the electronic communications, verify the user/profile names involved, and maintain a copy of the communications as part of the case file. Unless otherwise noted, the controlled buys and telephone contacts summarized below were conducted pursuant to the above procedures. Further, unless otherwise noted, all drug results are based on presumptive field testing and field weights without packaging.

**TIII Authorization**

20. Case agents have been conducting court-authorized wire interceptions of communications associated with ten DTO lines beginning around mid-May 2025.

21. On May 13, 2025, the Honorable Lynn Adelman, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire communications to and from (414) 550-7820 (TARGET TELEPHONE 1), used by Quentin Apkarian, to and from (414) 550-8124 (TARGET TELEPHONE 2), used by Joey Miramontes, and to and from (414) 801-2099 (TARGET TELEPHONE 3) used by Christopher Badgett (EDWI 25-AP-3). On June 13, 2025, Judge Adelman entered an order authorizing an extension of the interception of wire communications to and from TARGET TELEPHONE 1, TARGET TELEPHONE 2, and TARGET TELEPHONE 3 (EDWI 25-AP-03 1st Extension). Interceptions

of TARGET TELEPHONE 1, TARGET TELEPHONE 2, and TARGET TELEPHONE 3 ended on July 12, 2025.

22. On June 4, 2025, the Honorable Lynn Adelman, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire communications to and from [redacted] TARGET TELEPHONE 4), used by [redacted] and to and from [redacted] (TARGET TELEPHONE 5) [redacted]. On July 3, 2025, Judge Adelman entered an order authorizing an extension of the interception of wire communications to and from TARGET TELEPHONE 4 and TARGET TELEPHONE 5 (EDWI 25-AP-04 1st Extension). There were no intercepted wire communications over TARGET TELEPHONE 4 as of July 16, 2025 and case agents ceased efforts to intercept said communications at 11:59 p.m. on July 23, 2025. Interceptions of TARGET TELEPHONE 5 ended on August 1, 2025.

23. On July 18, 2025, the Honorable Lynn Adelman, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire communications to and from (414) 252-9913 (TARGET TELEPHONE 6), used by Dale Fisher, (414) 888-2248 (TARGET TELEPHONE 7), used by Dale Fisher, (414) 640-2997 (TARGET TELEPHONE 8), used by Jesus Andrade Herrera, and (414) 865-1414 (TARGET TELEPHONE 9), used by Jesus Andrade Herrera. Interceptions over these four telephones commenced on July 21, 2025. There were no intercepted wire communications over TARGET TELEPHONE 8 and case agents ceased efforts to intercept said communications on August 1, 2025. Interceptions over TARGET TELEPHONE 6, TARGET TELEPHONE 7, and TARGET TELEPHONE 9 are ongoing and are scheduled to end on August 19, 2025. Case agents have intercepted numerous drug-related conversations pursuant to the same.

24. On August 11, 2025, the Honorable Lynn Adelman, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire communications to and from (414) 651-4591 (TARGET TELEPHONE 10), used by Jesus Andrade Herrera. Interceptions TARGET TELEPHONE 10 commenced on August 11, 2025 and is scheduled to end on September 10, 2025.

**Prior Investigation as to Leflore**

25. During the interception period coupled with controlled buys with CHS #1, case agents discovered the user of cellular phone number **414-340-9162 (Target Cell Phone),** determined to be Elion Leflore, is a likely crystal methamphetamine and cocaine source of supply to Miramontes et al.

26. On June 4, 2025, Honorable Magistrate Judge William E. Duffin authorized the electronic surveillance of **414-340-9162** (**Target Cell Phone)** (25MJ70), which was serviced on the Service Provider, determined to be Verizon Wireless, and a listed subscriber of "No Name". At that time, case agents did not know the identity of the user of **414-340-9162** (**Target Cell Phone).** As the investigation into **414-340-9162** (**Target Cell Phone)** continued, case agents identified the user as Elion Leflore. On July 8, 2025, Honorable Magistrate Judge Stephen C. Dries authorized the electronic surveillance of **414-340-9162** (**Target Cell Phone)** (25M434, which was serviced on the Service Provider.

27. Elion Leflore (hereinafter, "Leflore") DOB: March 7, 2001, is the user of telephone number **414-340-9162** (**Target Cell Phone**). Leflore was referred to in prior affidavits regarding the investigation into the DTO as UM9011 and UM9162 as he had not yet been positively identified. Leflore is a high-level crystal methamphetamine source of supply for Miramontes. Based on more recent wire intercept, case agents believe he is also a source of cocaine for Miramontes. Through physical surveillance and intercepted wire communications of TARGET

TELEPHONE 2, case agents have determined that Leflore supplied crystal methamphetamine to Miramontes on May 29, 2025, and June 16, 2025. Leflore has a listed address of 5879 North 77th Street, Milwaukee, Wisconsin; however, historical cellular phone records and physical surveillance revealed that Leflore routinely stays in the 5280 Lovers Lane, Milwaukee, Wisconsin, apartment complex. Leflore has one adult felony conviction for First Degree Recklessly Endangering Safety use of a Dangerous Weapon (Date of Conviction 10-30-2020). Leflore is currently under WIDOC supervision for the above conviction with a maximum discharge date of October 22, 2028.

28. Case agents believe Leflore is the user of **414-340-9162 (Target Cell Phone)** because during physical surveillance, case agents observed the user of (414) 242-9011 and **414-340-9162 (Target Cell Phone)** to be a black male with shoulder length dreadlock style hair and driving a black Audi with Wisconsin Registration AZX-3564 registered to Tiffany Delaney. Specifically, case agents observed this black male at locations consistent with locations where the user of (414) 242-9011 and **414-340-9162 (Target Cell Phone)** indicated he would be in court authorized intercepted calls.

29. On June 3, 2025, at 12:55PM, court authorized interceptions over (414) 550-8124 (TARGET TELEPHONE TWO) (Miramontes) captured an outgoing call from Miramontes to **414-340-9162 (Target Cell Phone)**. During the conversation, Miramontes and the user of **414-340-9162 (Target Cell Phone)** (Leflore) discussed meeting in the area of Miramontes' residence. Shortly thereafter, physical surveillance observed Miramontes and Apkarian meeting up with the operator of the black Audi (AZX3564). Physical surveillance observed that the Audi's driver was a black male with dreadlock style hair. TFO Contreras was able to obtain video of the black male as TFO Contreras drove past while the black male was entering into the Audi. At the time of the

physical, case agents were unable to positively identify the black male, but his appearance was generally consistent with Leflore.

30. On June 12, 2025, TFO Keland was conducting physical surveillance on the Audi when Leflore (at the time still unidentified) emerged from the apartment building of 5280/5282 Lovers Lane, Milwaukee, Wisconsin and entered the Audi. TFO Keland was out of position to make a positive identification, but, at approximately 12:26PM, TFO Keland observed Leflore enter the Audi and leave the area. I reviewed the court ordered geo location records for **414-340-9162 (Target Cell Phone)** which showed the device to be in the general vicinity of 5280 Lovers Lane, Milwaukee, Wisconsin, up until 12:25PM. At 12:36PM, an automated license place reader camera positioned at West Silver Spring Drive and 91st Street captured the Audi traveling eastbound on West Silver Spring Drive. The next geographic location for **414-340-9162 (Target Cell Phone)** occurred at 12:41PM, when the device was located approximately 2 miles northeast of 5280 Lovers Lane, Milwaukee, Wisconsin, and one mile northeast of the license plate reader at North 91st Street and West Silver Spring Drive, in the general area of North 80th Street and West Florist Avenue. Based on my training, experience, and knowledge of this investigation, I believe that this pattern of movement corresponds to Leflore leaving in the Audi with the cellular device assigned **414-340-9162 (Target Cell Phone)**.

31. On June 13, 2025, while conducting physical surveillance on the Audi, TFO Seeger obtained video evidence of Leflore coming and going from the Audi which was parked in the parking lot of 5280 Lovers Lane, Milwaukee, Wisconsin. At 1:40PM, TFO Seeger observed Leflore enter the Audi and leave the area. I reviewed the court ordered geo location records for **414-340-9162 (Target Cell Phone)**, which showed the device to be in the general vicinity of 5280 Lovers Lane, Milwaukee, Wisconsin, up until 1:40PM. At 1:42PM, an automated license place

reader camera positioned at West Silver Spring Drive and 91st Street captured the Audi traveling eastbound on West Silver Spring Drive. The next geographic location for **414-340-9162 (Target Cell Phone)** showed the device nearly two miles east at 1:56PM. I believe that this pattern of movement corresponds to Leflore leaving in the Audi with the cellular device assigned (**414-340-9162 (Target Cell Phone)**. Case agents compared the TFO Seeger's captured video to known images (Wisconsin Department of Correction (WIDOC) of Leflore, which conclusively show them to be the same person.

32. Case agents also learned through WIDOC records that Tiffany Delaney is the mother of Elion Leflore.

33. Case agents believe that Leflore is the same individual who previously used telephone number of (414) 242-9011 (UM9011) to communicate with Miramontes via TARGET TELEPHONE 2. I believe that Leflore and UM9011 are the same individual because I listened to several intercepted communications between Miramontes and UM9011 and Miramontes and the user of **414-340-9162 (Target Cell Phone)** and recognize the voice of UM9011 to be the same as the user of **414-340-9162 (Target Cell Phone)**. When (414) 242-9011 stopped being used by the user, I found through pen register/trap and trace records that the IMEI number for the device using (414) 242-9011 is the same IMEI number as the device being used by **414-340-9162 (Target Cell Phone)**. Pen register/trap and trace data for (414) 242-9011 shows that (414) 242-9011 stopped being used on approximately May 28, 2025. Pen register/trap and trace data for **414-340-9162 (Target Cell Phone)** shows that **414-340-9162 (Target Cell Phone)** began to receive/place calls on approximately May 28, 2025. I conducted a common contacts analysis of the data from (414) 242-9011 and **414-340-9162 (Target Cell Phone)** and identified 31 common contacts, further confirming my belief that these two numbers had one user and that **414-340-9162 (Target Cell**

**Phone)** is a replacement number for (414) 242-9011. Further, since Judge Adelman court authorization of wire interceptions over TARGET TELEPHONE 6 and TARGET TELEPHONE 7, case agents have intercepted drug-related conversations with **414-340-9162 (Target Cell Phone)**.

34. On August 8, 2025, the court authorized electronic surveillance for **414-340-9162 (Target Cell Phone 1)** expired.

35. On August 11, 2025, the Honorable Nancy Joseph signed an order for pen register/trap and trace (PRTT) data for telephone number **414-340-9162 (Target Cell Phone 1)** (App. No. 17003).

**Prior Investigation as to Gee**

36. During the interception period coupled with controlled buys with CHS #1, case agents discovered the user of cellular phone number **414-627-1965 (Target Cell Phone 2),** determined to be Shannon Gee, is a likely crystal methamphetamine and cocaine source of supply to Fisher.

37. Shannon Gee (hereinafter "Gee"), DOB: June 1, 1976, is the user of telephone number **414-627-1965 (Target Cell Phone 2)**. Gee is a known associate of Fisher. Case agents believe that Gee is involved in drug trafficking activities with Fisher. Physical surveillance observed Gee's Dodge Ram pickup arrive at Fisher's residence on June 13, 2025, and Dale Fisher exited the residence and entered the Dodge Ram. A few minutes later, Fisher exited the Dodge Ram and reentered his residence. Case agents believe that the short duration of this contact, coupled with Gee's criminal history, that Gee is actively involved in trafficking controlled substances with Fisher. On July 5, 2025, pen register/trap and trace data showed two outgoing calls from TARGET TELEPHONE 7 to **414-627-1965 (Target Cell Phone 2)** (believed to be used by

Gee) at 8:03PM and 8:11PM, and TARGET TELEPHONE 7 received an incoming call from **414-627-1965 (Target Cell Phone 2)** at 8:32PM. At 8:33PM, pole camera surveillance captured a white female, believed to Carmody, outside near Fisher's garage pacing in the alley. Moments later, at 8:34PM, pole camera surveillance captured Gee's Dodge pickup truck (VY1955) arrive in the alley, and the female believed to be Carmody immediately approached the truck. The female believed to be Carmody reached into the driver side window and appeared to obtain something from the truck's operator. Based on my training and experience, I believe that Fisher or Carmody (using TARGET TELEPHONE 7) contacted Gee at **414-627-1965 (Target Cell Phone 2)** for controlled substances, and Gee arrived in the alleyway to deliver the controlled substances to the female (believed to be Carmody). Gee has adult felony convictions for Possession with Intent to Deliver Cocaine Base 10g-40g (Date of Conviction 08-22-1994) Possession with Intent to Deliver Cocaine 15-40g (Date of Conviction 01-14-1997), Possession of THC 2nd and Subsequent (Date of Conviction 05-24-2001), Possession with Intent to Deliver Cocaine >40G (Date of Conviction 07-20-2005), Possession of THC 2nd and Subsequent (Date of Conviction 10-07-2010), Possession of Firearm by Felon (Date of Conviction 04-11-2023) and Possession of Firearm by Felon (Date of Conviction 04-11-2023). Gee has a pending felony case and is currently released on bond through Milwaukee County (24CF1270) for Possession with Intent to Deliver Cocaine >40grams and Possession with Intent to Deliver THC 200g-1000g. Gee is currently on WIDOC supervision with a maximum discharge date of November 27, 2027.

38. Case agents believe Gee is the user of **414-627-1965 (Target Cell Phone 2)** because (1) I checked with the WIDOC on June 20, 2025, and learned the number **414-627-1965 (Target Cell Phone 2)** is documented as Shannon Gee's current telephone number; (2) on June 13, 2025, TFO Seeger observed Shannon Gee's Dodge pickup arrive at Fisher's residence at approximately 5:30PM. Court ordered phone records for Fisher's device ((414) 252-9913—

TARGET TELEPHONE 6) showed that, at 5:12PM, (414) 252-9913 (TARGET TELEPHONE 6) placed an outgoing call to **414-627-1965 (Target Cell Phone 2)** (believed to be Gee). This is consistent with Fisher speaking with Gee and arranging for Gee to meet at Fisher's residence and Gee arriving there shortly thereafter. I believe this pattern of the call and observation further corroborates that Gee is using **414-627-1965 (Target Cell Phone 2)**; and (3) as detailed above, on July 5, 2025, pen register/trap and trace data showed three calls between TARGET TELEPHONE 7 and **414-627-1965 (Target Cell Phone 2)** and, after the last call, a vehicle associated with Gee arrived near Fisher's residence. The truck's operator then conducted what I believe to be a drug transaction with a female (believed to be Carmody). This is consistent with Fisher or Carmody speaking with Gee and arranging for Gee to meet at Fisher's residence and Gee arriving there shortly thereafter to provide controlled substances. I believe this pattern of calls and observations further corroborates that Gee is using **414-627-1965 (Target Cell Phone 2)**. Further, since Judge Adelman court authorization of wire interceptions over TARGET TELEPHONE 6 and TARGET TELEPHONE 7, case agents have intercepted numerous drug-related conversations with telephone **414-627-1965 (Target Cell Phone 2)**.

39. Case agents determined telephone **414-627-1965 (Target Cell Phone 2)** has a Service Provider of US Cellular and a listed subscriber is "Sam Doe", with a listed address of 4241 West Capitol Drive, Milwaukee, Wisconsin, which case agents as determined to be a US Cellular location. Based on training and experience, case agents are aware that those engaged in drug trafficking will often use false names and addresses connected to telephones in an attempt to evade law enforcement.

**<u>Prior Investigation as to Love-Bond</u>**

40. During the interception period coupled with controlled buys with CHS #1, case agents discovered the user of cellular phone number **414-573-3465 (Target Cell Phone 3),** determined to be Ondra Love-Bond, is a source of narcotics supply for Dale Fisher.

41. Ondra Love-Bond (herein after "Love-Bond"), DOB: July 1, 1990, is the user of telephone **414-573-3465 (Target Cell Phone 3)**. Since interceptions began over TARGET TELEPHONE 6 and TARGET TELEPHONE 7, case agents learned that Love-Bond is a source of narcotics supply for Dale Fisher. Specifically, on July 22, 2025, interceptions over TARGET TELEPHONE 6 captured an outbound call from TARGET TELEPHONE 6 (Dale Fisher) to (**414-573-3465 (Target Cell Phone 3)**. In context, I believe that Fisher requested that the user of **414-573-3465 (Target Cell Phone 3)** bring controlled substances to Fisher and the user of (**414-573-3465 (Target Cell Phone 3)** said he is "just jumping in my van now" to head to Fisher's. A short time later, physical surveillance observed a black minivan arrive in front of Fisher's residence and Dale Fisher entered into the van. Physical surveillance obtained the license plate of the van to be BAP-8603. I later found a traffic stop that occurred on July 19, 2025 wherein Glendale Police conducted a traffic stop on the same vehicle and Ondra Love-Bond was identified as the operator. Love-Bond has prior adult felony convictions for Possession of Narcotic Drugs (Date of Conviction 02-25-2015), Possession with intent to Deliver Narcotics (Date of Conviction 08-21-2018), and Substantial Battery (Date of Conviction 12-19-2018).

42. Case agents believe that Love-Bond is the user of **414-573-3465 (Target Cell Phone 3)** because: (1) a minivan known to be utilized by Love-Bond in the recent past arrived at Dale Fisher's residence shortly after Dale Fisher spoke to the user of **414-573-3465 (Target Cell Phone 3)** who told Dale Fisher that he would be on his way in his van. Further, since Judge Adelman court authorization of wire interceptions over TARGET TELEPHONE 6 and TARGET

TELEPHONE 7, case agents have intercepted numerous drug-related conversations with telephone **414-573-3465 (Target Cell Phone 3)**.

43. On July 23, 2025, the Honorable Stephen C. Dries signed an order for pen register/trap and trace (PRTT) data for telephone number **414-573-3465 (Target Cell Phone 3)** (App. No. 16958). Case agents determined that telephone number **414-573-3465 (Target Cell Phone 3)** has a service provider of AT&T and the subscriber is Unknown.

**<u>Recent Wire Intercepts to Telephone 414-340-9162 (Target Cell Phone) (Leflore)</u>**

44. On July 23, 2025, at approximately 4:50 p.m., law enforcement intercepted a call from Elion Leflore on **414-340-9162 (Target Cell Phone)** to Dale Fisher on TARGET TELEPHONE 6. During the call, Leflore asked Fisher "what you said for an ounce?" Fisher replied, "a pound?" and Leflore responded "no, no, no a zip." Fisher told Leflore "Let me call you back in two minutes cause I'm not even at the house, let me call you back in a second. How long how quick can you be here?" Leflore responded, "Shit couple minutes really shit."

45. Based on training and experience, case agents understand that narcotics traffickers use the term "zip" to describe an ounce of narcotics. Case agents believe that Leflore contacted Fisher to purchase one ounce of unidentified narcotics, likely methamphetamine. Fisher misunderstood Leflore initially and asked, "a pound?" Leflore clarified his order when he told Fisher "no, no, no, a zip." Fisher told Leflore that he would call him back in a few minutes after he returned to his residence where case agents believe Fisher stores his narcotics.

46. On July 29, 2025 at approximately 2:36 p.m., law enforcement intercepted a call from Elion Leflore on **414-340-9162 (Target Cell Phone)** to an unidentified female Leflore referred to as "Brittany" on TARGET TELEPHONE 7. During the call, Leflore asked Brittany what was going on and she responded "nothing, you tell me I'm talking with someone, I'm meeting with someone…" Leflore interrupted Brittany and said "aw… you trying to make some sales, fuck

you dude." Brittany replied "what?" Leflore said "now you trying to make some fucking sales. Fuck you." BRITTANY appeared to be confused and stated "I'm trying to make some sales? Of, of course I'm trying to make…" There was talking in the background on Leflore's line after which Brittany asked, "are you talking to me?" Leflore replied "no." Leflore continued to talk to someone in the background and told them "Now you trying to make some fuckin' sales. Fuck you bro." The conversation between Leflore and an unidentified individual in the background continued until Leflore ended the call by saying "Bri, call me later, whenever you get it together so we can start doing work on ourselves."

47. Based on previous investigation case agents know that Leflore is a narcotics trafficker and has a relationship with Dale Fisher based on narcotics trafficking. Based on training and experience, case agents understand that narcotics traffickers are territorial and become upset when other narcotics traffickers try to move into their turf as it could result in a loss of customers and therefore a loss of revenue. Based on Leflore's repeated statements "Now you trying to make some fuckin' sales. Fuck you bro," case agents believe that Leflore was dealing narcotics at the time of this phone call and became upset as he saw a rival drug trafficker conducting business in an area that Leflore considers his territory. After providing clarification to Brittany that he was not upset with her, Leflore directed Brittany to "call me later, whenever you get it together so we can start doing work on ourselves." Inasmuch as Leflore has a relationship with Fisher based on narcotics and was talking to Brittany on TARGET TELEPHONE 7, case agents believe that Brittany is also involved in Fisher and Leflore's narcotics trafficking and was getting "it together," presumably narcotics, for Leflore.

48. Case agents reviewed pen register/trap and trace (PRTT) data for TARGET TELEPHONE 6 and TARGET TELEPHONE 7 from July 31, 2025 through August 9, 2025 and

found TARGET TELEPHONE 6 to have 2 contacts or attempted contacts with **414-340-9162 (Target Cell Phone)** and TARGET TELEPHONE 7 to have 16 contacts or attempted contacts with **414-340-9162 (Target Cell Phone)**.

**<u>Recent Wire Intercepts to Telephone (414) 627-1965 (Gee)</u>**

49. On July 25, 2025, at approximately 11:16 am., law enforcement intercepted a call from Fisher on TARGET TELEPHONE 7 to Gee on **414-627-1965 (Target Cell Phone 2)**. During the call, Fisher asked Gee "Remember you said you were going to get me this shit early?" Gee replied "yeah" and Fisher asked, "is this early or no?" Gee replied "yep" and Fisher responded, "so you need me or no?" Gee told Fisher "yeah, come on." Fisher asked Gee if he was going to pick him up and then advised Gee to let Fisher know when he was on the way. Before ending the call, Fisher asked Gee "do you know anybody that needs any 24's or 20's or work boxes for their truck?"

50. Based on previous investigation, case agents believe Fisher and Gee have a relationship involving narcotics trafficking. Case agents believe that Fisher's question to Gee "Remember you said you were going to get me this shit early?" was Fisher inquiring about the status of a previous narcotics order Fisher had placed with Gee. Case agents believe that Fisher and Gee were going to meet up to complete the narcotics deal when Fisher asked if Gee was ready for him and Gee's replied "yeah, come on." Case agents understand that narcotics traffickers often accept payment for narcotics in stolen merchandise when their customers cannot pay for the narcotics in cash. Case agents believe it is possible that Fisher's statement "do you know anybody that needs any 24's or 20's or work boxes for their truck?" meant that he had received 20 inch and 24 inch tire rims and truck workboxes as payment from one of his customers for narcotics and Fisher was trying to find someone to buy them for cash.

51. On August 4, 2025, at approximately 5:04 pm, law enforcement intercepted a call from Fisher on TARGET TELEPHONE 7 to Gee on **414-627-1965 (Target Cell Phone 2)**. During the call, Fisher stated to Gee that Fisher need 8 and 3. Fisher clarified that he needed 8 girls and 3 dudes.

52. Based on previous investigation, case agents believe Fisher and Gee have a relationship involving narcotics trafficking. Case agents believe that Fisher's stated was discussing amounts of controlled substance. Based on training, experience, and the investigation into the DTO, case agent know Fisher uses the term "girl" to refer to cocaine and "dudes" to refer to "boy" or heroin. Case agents believe Fisher's statement is ordering 8 grams of cocaine and 3 grams of heroin from Gee (he needed 8 girls and 3 dudes).

53. On August 11, 2025, at approximately 7:05 pm, law enforcement intercepted a call from Fisher on TARGET TELEPHONE 6 to Gee on **414-627-1965 (Target Cell Phone 2)**. Fisher orders "four girls two dudes". Gee repeats "four girls two dudes". Fisher instructs Gee to come to the back. Gee states he "ain't going to no front". Fisher laughs and says bye.

54. Based on previous investigation, case agents believe Fisher and Gee have a relationship involving narcotics trafficking. Case agents believe that Fisher's stated was discussing amounts of controlled substance. Based on training, experience, and the investigation into the DTO, case agent know Fisher uses the term "girl" to refer to cocaine and "dudes" to refer to "boy" or heroin. Case agents believe Fisher's statement is ordering 4 grams of cocaine and 2 grams of heroin from Gee (four girls two dudes). Fisher told Gee to come to the back of the residence, which has been consistent with surveillance and other wire communication, in which Fisher does not want to conduct drug transactions in the front of the house, which appears to be in an attempt to evade law enforcement.

**<u>Recent Wire Intercepts to Telephone (414) 573-3465 (Love-Bond)</u>**

55. On July 30, 2025, at approximately 2:46 p.m., law enforcement intercepted a call from Love-Bond on **414-573-3465 (Target Cell Phone 3)** to Fisher on TARGET TELEPHONE 7. During the call, Love-Bond is upset with Fisher because he has not answered Love-Bond's phone calls to Fisher's other phone. Fisher advised Love-Bond that he loaned his other phone to his neighbor who uses the wi-fi and now Fisher's phone is dead. Love-Bond told Fisher that he's upset with an unidentified female who owed him money. Love-Bond stated, "I don't want the money no more." Fisher spoke over Love-Bond and then Love-Bond stated "I'm taking one of them air pressure washers…or… I'm taking something, something that's worth way more." Fisher asked Love-Bond if he received Fisher's request last night about "Waupun." Love-Bond asked Fisher "Where he at?" Fisher was difficult to understand but advised Love-Bond that he was going to return a call to an unidentified male in Waupun. Love-Bond told Fisher that he had to drop something off and then he would stop by Fisher's residence.

56. Based on previous investigation, case agents believe Fisher and Love-Bond have a relationship based on narcotics trafficking. Based on training and experience, case agents believe that Love-Bond is upset with an unidentified female who owes him money for an unidentified reason possibly for narcotics that Love-Bond provided to the unidentified female. Based on training and experience, narcotics suppliers often accept alternative forms of payment for narcotics when their customers don't have money. Oftentimes these alternative forms of payment are stolen goods. Case agents believe that an unidentified female owes Love-Bond for narcotics and instead of accepting a cash payment he is "taking one of them air pressure washers…or… I'm taking something, something that's worth way more." Case agents also believe in the possibility that Love-Bond and Fisher are working together with an unidentified male in the Waupun area who

may be supplying them with narcotics. Case agents believe Love-Bond's question "Where he at?" may mean that Love-Bond is asking Fisher if Waupun has the narcotics that they want or is charging the price that they want for the narcotics.

57. On August 2, 2025, at approximately 1:38 pm, law enforcement intercepted a call from Love-Bond on **414-573-3465 (Target Cell Phone 3)** to Fisher on TARGET TELEPHONE 6. During the call both subjects argue about money. Love-Bond also discussed buying two new Glocks. Love-Bond tells Fisher that he (Love-Bond) gives Fisher bags to make money, but Fisher is intentionally always short and fucks up money. Love Bond tells Fisher he is going to pull up.

58. Based on training and experience, case agents believe that Love-Bond was discussing buying firearms with Fisher (Glocks). Further, case agents being Love-Bond discussed providing Fisher with controlled substances (bags) to sell (make money), but that Fisher was either using the controlled substance or not having his customers pay for the drugs being sold (intentionally always short and fucks up money).

59. On August 3, 2025, at approximately 1:15 p.m., law enforcement intercepted a call from Love-Bond on **414-573-3465 (Target Cell Phone 3)** to Katie Carmody on TARGET TELEPHONE 7. During the call, Carmody and Love-Bond discussed an argument and altercation Carmody had with Fisher recently. Carmody told Love-Bond that she asked Fisher "Are you smoking meth? He's like what are you talking about? I said cause you ain't have no powder, you ain't, you, you better not, you should be tired I said you're running around doing all this shit and it's just his (unintelligible) the way he's acting is, is different." Later in the conversation Carmody told Love-Bond "I went out to the garage and I hid all of the um… bongs that he's, he had out there."

60. Based on training and experience, case agents believe that Fisher and Carmody's recent altercation was due to Carmody accusing Fisher of smoking methamphetamine. Based on Carmody's statement "I said cause you ain't have no powder," followed by her description of Fisher's physical activity and lack of associated fatigue, case agents believe that Fisher did not have any cocaine available to use as a stimulant which caused Fisher to use methamphetamine instead. Fisher's frequent agitation, rapid pace of communication, and slurred speech during intercepted calls would provide additional credibility to the belief that Fisher is using stimulants, specifically methamphetamine.

61. On August 10, 2025, at approximately 5:37 p.m., law enforcement intercepted a call from Katie Carmody on TARGET TELEPHONE 7 to Love-Bond on **414-573-3465 (Target Cell Phone 3)**. During the call, Carmody asks Love-Bond for a "basketball" and that she will have to take it to somebody. Love-Bond and Carmody talk about a neighbor from across the street who is looking for something "white" not something "brown". Carmody tells Love-Bond that a female said the "feds" was watching "Dre". Love-Bond states that Carmody should have asked that females show she heard that from. Love-Bond and Carmody discuss Fisher shooting a gun early that day and Carmody is concerned about the police possibility coming to the house and finding the gun. Love-Bond discusses switching out Fisher's gun. Carmody tell Love-Bond she is going to look for the gun and call Love-Bond back.

62. Based on training and experience, case agents believe that Carmody is discussing controlled substances with Love Bond. Based on training and experience, case agents believe "basketball" refers to 3.5 grams of a controlled substance. Case agents also believe that the Carmody and Love-Bond are discussion different type of heroin when discussing the neighbor looking for something "white" not "brown" as case agents are aware that heroin can come in

different colors like white, tan, brown, black, etc. Case agents are also aware that those engaged in drug trafficking will share information regarding law information investigations or concerns about law information detection to protect the DTO. This would be consistent with Carmody sharing with Love-Bond that a female believes the federal government (feds) to be watching Love-Bond ("Dre"). Further, case agents believe that Fisher was involved in an firearms offense early that day, and Love-Bond and Carmody were discussing protecting the DTO from law enforcement finding the firearm (police possibility coming to the house and finding the gun; Carmody is going to look for the gun and call Love-Bond back). Case agent later confirmed through wire intercepts and review of Milwaukee Police Department reports, that Carmody was traffic stopped by the Milwaukee Police Department on August 10, 2025, at approximately 8:10 pm. Carmody was in possession of a 10 mm Glock, bearing serial number BEKK650 during a traffic. Carmody was arrested and later released.

63. Based on my training and experience, the overall investigation, this pattern of phone contacts, and the circumstances of the controlled buy, I believe that Leflore is using telephone **414-340-9162** (**Target Cell Phone**), who is the same individual previously using 414-242-9011, Gee is using telephone number **414-627-1965 (Target Cell Phone 2)**, and Love-Bond is using telephone number **414-573-3465 (Target Cell Phone 3)** to engaged is drug trafficking with member of drug trafficking, as demonstrated above.

64. I believe that the historical location data requested for the **Target Cell Phones** will assist in identifying DTO stash locations and corroborating the locations of DTO members during relevant events such as the previously completed controlled buys. I believe that the call detail records requested will help identify other DTO members and potential sources of supply. I believe that the requested prospective location data will assist in proactive surveillance of DTO members

and will aid in the identification of DTO members/suppliers including stash locations, and meeting locations.

65. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

66. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Cell Phones**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices

to which they provide service in their normal course of business in order to use this information for various business-related purposes.

67. Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

**E-911 Phase II / GPS Location Data**

68. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phones**, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Providers' network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

69. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content. Currently, the **Target Cell Phone 1** has an IMEI of 352938142179626.

**Subscriber Information**

70. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes

under investigation because the information can be used to identify the **Target Cell Phones**' user or users and may assist in the identification of co-conspirators and/or victims.

71. I have a general understanding of how the cellular telephone network operates. I am aware that cell sites (towers) are strategically placed by cellular service providers, to provide a seamless operation so people can travel virtually anywhere and make or receive an uninterrupted call, send or receive text messages, or initiate a data session via their cellular phone. Usually, cell sites will be mounted high on a large pole, building, or other structure which provides line of sight with the population below. Cell sites are typically divided into sectors, which are made up of antennas connected to cellular radio transceivers. Each sector is mounted on the cell site and faces a specific direction to provide maximum cellular coverage for the people in the area. The range of the cell site and sectors depends on many factors to include environmental and geographic factors and whether it is located in a highly populated, urban environment or desolate rural area. Cell site location information (CSLI) does not provide an exact location of a cell phone; the basic call detail record data only provides the physical location of the cell site (latitude and longitude) and a direction (azimuth) the antennas are facing from the cell site.

72. I am aware when a person either initiates or receives a voice call, text message, or a data session (usage event) from their cellular device, the device broadcasts signals to the cell site that routes its communications. These signals include a cellular device's unique identifiers as well as details about the usage event. I am also aware cellular service providers collect and store these usage event details (transaction records) associated with cellular phone numbers during the normal course of business. The usage event records, commonly referred to as call detail records, stored by their respective cell phone company, mostly contain the following information with some exceptions based on the specific carrier: Date, time, type of event, duration, phone number

initiating the usage event (called, calling), even if caller identification is blocked by the calling party, text message transaction data, the international mobile equipment identifier (IMEI), the international mobile subscriber identifier (IMSI), IP packet data session logs, and cell site location and sector information at the beginning and ending of each usage event.

73. I believe such information is relevant and material to the ongoing criminal investigation as it may provide investigators with information supporting or refuting the suspect's alibi, and assist with determining other unidentified co-conspirators, and/or show the general geographic location of the target device before, during, and after the commission of the crime. This is basic information and does not provide an exact location of the person's cell phone nor does it identify the other parties.

74. I am aware that obtaining and preserving historical cell phone call detail and specialized location records could also prove to be fruitful, as such records could assist investigators not only with identifying those who may have been in contact with the victim(s) or potential co-conspirators, but may also allow investigators other opportunities, including, but not limited to, confirmation or the disproving of alibis, statements, and other observations.

75. I know that these records such as those associated with the target phone, are not kept or preserved indefinitely by the cellular service providers and are purged at different intervals. Obtaining and preserving these records at this point in the investigation will ensure the investigators assigned to the case will have them available, and if the case were to go "cold", future investigators will have access to the records which would otherwise likely not be obtainable. Not only could the preserved records assist in proving one's guilt, they could also assist in proving one's innocence.

76. I am aware cellular service providers maintain specialized location records consisting of engineering data. These data sets are used by the providers to troubleshoot coverage areas and report back on potential dead spots, all with the intent to oversee and optimize the cellular network. Specialized location records typically contain data for every usage event, to include technology details (e.g. voice, text, data), resource usage, and call failure information. They can also include data for incomplete calls (e.g. denied calls and set-up failures). These records not only include the basic call detail records, but also an estimation of the target phones location (Latitude and longitude) with a possible accuracy radius, and/or the distance from the cell site at the time of the usage event. Utilizing specialized location records can provide investigators with a much smaller footprint of a target phones location and could place a target phone within close proximity of a crime scene before, during and after a crime. Each carrier uses their own nomenclature to describe the technology used to obtain this data including: NELOS (Network Event Location System) – T-MOBILE, RTT (Round Trip Time/Return Trip Time/Real Time Tool) - Verizon &amp U.S. Cellular, PCMD (Per Call Measurement Data) – Sprint & U.S. Cellular, and TDOA (Time Difference of Arrival) or Timing Advance Information – T-Mobile & Metro by T-Mobile. I believe this information is relevant and material to the investigation as it provides supplemental geo-location information which, while not precise enough to identify a specific house, is accurate enough to provide block-level accuracy, in some cases. Investigators can use this information to correlate existing fact patterns and timelines to confirm or refute prior statements and/or evidence regarding the location of the target device.

77. I am seeking evidence of communication between identified subject(s) and previously unidentified individuals and entities. In my training and experience, associates

communicate together via phone calls, text messages, and social media applications via data sessions and these communications most commonly occur on or through cellular devices.

78. In my training and experience individuals often use digital devices and cellular devices to post messages to others on social networking applications. In my training and experience it is possible for cellular phone users to use a variety of messaging platforms including the cellular SMS and MMS technology, as well as third-party applications like Facebook Messenger, WhatsApp, Snapchat, iMessage, and many other applications. Therefore, I seek to search all the communication evidence maintained by the service provider.

79. I am also seeking evidence of association. I know that establishing the association of co-conspirators is important in proving a concert of action between multiple persons. In my training and experience, one of the most effective methods of linking co-conspirators together is by reviewing the call detail records maintained by the cellular service providers. In my training and experience, associates communicate together via voice calls, text messages and third-party applications by means of a data usage event, therefore I am seeking the call detail record evidence to demonstrate the associations of the individuals in this case. Because this evidence is intended to be used to show associations of the user/owner of the device and co-participants, I am seeking the above items regardless of the dates the information was created.

80. I am aware cellular service providers offer their customers optional free or paid backup digital storage for some of the content stored on their device. These services are offered to secure and restore their digital information in the event their mobile device is lost or stolen. Because these digital storage services are remote and transparent to the consumer, they are often referred to as 'cloud' storage. Customers can elect to digitally store the contents of their electronic phone book including details of their contacts, names, phone numbers, email addresses, and other

data, calendar events, short message service (SMS) messages, commonly referred to as text messages, multimedia message service (MMS) messages, consisting of pictures, videos, and/or audio files with or without accompanying text, call logs of incoming, outgoing, and missed calls, digital images and videos, music and audio files, and electronic files such as documents and spreadsheets. I believe this information is relevant and material to the matter at hand as the contents of the remote digital storage may contain information presently unavailable to investigators including: associated identifying information from the user's contacts which would tend to identify possible suspect's, witnesses, associates, and/or co-conspirators, the content of messages sent between those parties, digital images and videos which may contain evidence of the crime under investigation, and documents related to same.

81. I am aware cellular service providers maintain a master cell site list of all cell sites within their network. These cell site lists will include the specific switch, cell site number, name, physical address, latitude and longitude of the cell site, all sectors associated with each cell site, azimuth, and beam-width of each related sector. When reviewing call detail and specialized location records from the carriers, the records may only reference a specific switch, cell and sector, or LAC and CID/eNodeB ID, related to each usage event; they usually will not include the location (latitude and longitude) of the actual cell site and azimuth of the sector. It becomes necessary to reference a cell site list in order to plot the exact location of the cell site and to identify the azimuth of the sector used associated with specific usage events.

82. Also, in the course of the investigation and review of the call detail and specialized location records, it may become necessary to visualize all cell sites within a geographic region of interest, not just the cell sites used by the target phone. It is just as important to show cell sites not used by a target phone, as it is to show cell sites used. By obtaining the master cell site lists from

the cellular service providers, investigators are able to plot all of the cell sites in a given region, helping investigators with disproving of alibis, statements, and other observations evidenced by the records.

83. I am seeking evidence of ownership, use, and identification of the subscriber, customer or owner of the electronic communication information contained in the records retained by the cellular service provider. I am aware, depending on whether the account is post-paid or pre-paid, a consumer must provide information to the cellular service provider. Post-paid accounts are credit based whereby a customer is provided service and then billed after the provision of services. These types of accounts require sufficient identifying information to enable the cellular service provider to make a determination regarding credit worthiness and recourse in the event the consumer defaults on their contractual agreement. The information required by most cellular service providers include the customer's personal identifying information, verified using government issued identification or other means, residential address, alternate contact phone numbers, and electronic mail (email) address(es). Additional information can include the type of service plan, additional features subscribed to, such as cloud storage and additional phones on the same account, device type and unique identifiers including IMEI and IMSI, method and source of payment information including financial institution and direct billing checking account numbers, credit or debit card numbers, and/or third-party payment processors, and customer service representative account comments and notes. I believe this information is relevant and material to the matter at hand as it serves multiple purposes including: identifying the subscriber to the target phone number, providing investigators with additional information and leads including subscriber address, additional phone numbers, and/or email addresses, device identifiers used to correlate any seized phones with the account, previously unidentified phones subscribed to on the same account,

and financial information. I know that ownership and control of a digital device can be placed at issue through a simple denial, "that is not my phone." In my training and experience some of the best ways to establish ownership and control are by reviewing account information and subscriber records from cellular service providers.

84. I am aware of the ease of being able to purchase a pre-paid cellular phone, and how it has impacted law enforcement's effort when attempting to identify criminals and locate wanted felons. It becomes very difficult, sometimes impossible, to determine the identity of a subscriber when the pre-paid providers do not require the identity of the person when obtaining/purchasing a pre-paid cellular phone. From prior training and experience, I know of many cases where pre-paid phones were used by suspects to further facilitate their criminal behavior, with the intent of concealing their true identity. Despite the lack of personally identifiable information, prepaid accounts can still provide investigators with information to identify the user. By examining the call detail and specialized location records of a pre-paid target phone, investigators can examine call and text incoming and outgoing usage events to help identify co-conspirators, associates, friends and family, who could help identify the party utilizing the pre-paid phone. Additionally, pre-paid services typically require some mechanism of payment including pre-paid cards, cash payments at retail establishments, or via an online portal. The financial information may assist investigators with identifying the locations where the pre-paid cards were purchased, the location of the retail establishments used for cash payments, and/or associated online account information and Internet Protocol (IP) addresses.

## AUTHORIZATION REQUEST

85. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

86. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

87. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

88. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until March 27, 2026, consistent with the omnibus order signed buy Magistrate Judge Duffin on March 27, 2025, after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phones** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510)

or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

89. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phones** outside of daytime hours.

<u>**ATTACHMENT A1**</u>
**Property to Be Searched**
**Matter No. 2025R00094**

1. Records and information associated with the cellular device assigned call number **414-340-9162**, with International Mobile Equipment Identity number 352938142179626 (referred to herein and in Attachment B1 as "the **Target Cell Phone 1**"), with listed subscriber(s) "No Name" that is in the custody or control of Verizon Wireless ("Service Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921.

2. The **Target Cell Phone 1**.

<u>**ATTACHMENT B1**</u>
**Particular Things to be Seized**
**Matter No. 2025R00094**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A1 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A1:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone 1** for the time period **August 4, 2025 to the present**:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone 1**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the **Target Cell** Phone 1 for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone 1** will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical

GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

Honorable Nancy Joseph, United States Magistrate Judge, has also issued an order pursuant to 18 U.S.C. § 3123, dated August 11, 2025, for such information associated with the **Target Cell Phone 1**.

c. Information about the location of the **Target Cell Phone 1** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone 1** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Joshua Ramos, Christopher Badgett, Kiara Ramos, Trayveon Roy, Isaac Sawyer, [redacted], Raymond Serrano, Deparis Hardin, Erica Carrion, Antonio Mendoza, Kevin Jones, Krystal Castillo, Andrew Gbur, Elion Leflore, Dale Fisher, Ryan Fisher, Travis Page, Shannon Gee, the unidentified male user of telephone number (414) 892-1281 (herein "UM1281"), the unidentified male user of telephone number (414) 651-3460 (herein "UM3460"),

Jesus Andrade Herrera, Katie Carmody, Anthony Buda, Mohamed Zormati, Edward Saez, Joshua Al Hakeem-Maaji Murphy, [redacted] Tiffany McCarver, Emmitt Hawkins, Orlando Rivas, [redacted], Patricia Andrade Gomez, Ondra Love-Bond, Yesica Alvarez, Marlon Triplett, Uziel Perez Aponte, and others known and unknown, during the period of October 1, 2024 to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## ATTACHMENT A2
**Property to Be Searched**
**Matter No. 2025R00094**

1. Records and information associated with the cellular device assigned call number **(414) 627-1965**, (referred to herein and in Attachment B2 as "the **Target Cell Phone 2**"), has a listed subscriber of "Sam Doe" and a listed address of 4241 West Capitol Drive, Milwaukee, Wisconsin that is in the custody or control of US Cellular ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way Parsippany NJ 07054.[4]

2. The **Target Cell Phone 2**.

---

4 According to the pleadings, as of August 6, 2025, **Target Cell Phone 2**, when researched, was assigned to US Cellular, which is now a T-Mobile US company as of a completed merger on August 1, 2025. US Cellular's updated address is 4 Sylvan Way Parsippany NJ 07054. US Cellular's former address was 8410 W. Bryn Mawr Avenue, Suite 800, Chicago, IL 60631.

**<u>ATTACHMENT B2</u>**
**Particular Things to be Seized**
**Matter No. 2025R00094**

## III. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A2 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A2:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone 2** for the time period **January 1, 2025 to the present**:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone 2**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the **Target Cell Phone 2** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone 2** will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical

GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

Honorable Nancy Joseph, United States Magistrate Judge, has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone 2**.

c. Information about the location of the **Target Cell Phone 2** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone 2** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## IV. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Joshua Ramos, Christopher Badgett, Kiara Ramos, Trayveon Roy, Isaac Sawyer, [redacted], Raymond Serrano, Deparis Hardin, Erica Carrion, Antonio Mendoza, Kevin Jones, Krystal Castillo, Andrew Gbur, Elion Leflore, Dale Fisher, Ryan Fisher, Travis Page, Shannon Gee, the unidentified male user of telephone number (414) 892-1281 (herein "UM1281"), the unidentified male user of telephone number (414) 651-3460 (herein "UM3460"),

Jesus Andrade Herrera, Katie Carmody, Anthony Buda, Mohamed Zormati, Edward Saez, Joshua Al Hakeem-Maaji Murphy, Gilberto Alverio Jr. Tiffany McCarver, Emmitt Hawkins, Orlando Rivas, [redacted], Patricia Andrade Gomez, Ondra Love-Bond, Yesica Alvarez, Marlon Triplett, [redacted], and others known and unknown, during the period of October 1, 2024 to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# ATTACHMENT A3
## Property to Be Searched
## Matter No. 2025R00094

1. Records and information associated with the cellular device assigned call number **414-573-3465**, (referred to herein and in Attachment B3 as "the **Target Cell Phone 3**"), the subscriber is unknown that is in the custody or control of AT&T ("Service Provider") a wireless telephone service provider headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida, 33408.

2. The **Target Cell Phone 3**.

<u>**ATTACHMENT B3**</u>
**Particular Things to be Seized**
**Matter No. 2025R00094**

## V. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A3 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A3:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone 3** for the time period **January 1, 2025 to the present**:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone 3**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the **Target Cell Phone 3** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone 3** will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical

GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

Honorable Stephen C. Dries, United States Magistrate Judge, has also issued an order pursuant to 18 U.S.C. § 3123, dated July 23, 2025, for such information associated with the **Target Cell Phone 3**.

c. Information about the location of the **Target Cell Phone 3** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone 3** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## VI. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Joshua Ramos, Christopher Badgett, Kiara Ramos, Trayveon Roy, Isaac Sawyer, [redacted] Raymond Serrano, Deparis Hardin, Erica Carrion, Antonio Mendoza, Kevin Jones, Krystal Castillo, Andrew Gbur, Elion Leflore, Dale Fisher, Ryan Fisher, Travis Page, Shannon Gee, the unidentified male user of telephone number (414) 892-1281 (herein "UM1281"), the unidentified male user of telephone number (414) 651-3460 (herein "UM3460"),

Jesus Andrade Herrera, Katie Carmody, Anthony Buda, Mohamed Zormati, Edward Saez, Joshua Al Hakeem-Maaji Murphy, [redacted] Tiffany McCarver, Emmitt Hawkins, Orlando Rivas,[redacted], Patricia Andrade Gomez, Ondra Love-Bond, Yesica Alvarez, Marlon Triplett, [redacted] and others known and unknown, during the period of October 1, 2024 to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.